Filed 4/15/14  P. v. Martinez CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICARDO MARTINEZ,<br><br>        Defendant and Appellant. | A136817<br><br>(Solano County<br>Super. Ct. No. FCR280797) |

Defendant Ricardo Martinez was convicted of two counts of murder by lying in wait after he shot his former domestic partner and her boyfriend.  Defendant contends the trial court erred in admitting hearsay evidence of several of his acts of domestic violence against the female victim, including a declaration the victim had prepared to support her application for a restraining order against him.  Because we find admission of the evidence to have been harmless under the standard of *Chapman v. California* (1967) 386 U.S. 18, we affirm.

## I.  BACKGROUND

Defendant was charged in an information, filed August 16, 2011, with two counts of murder.  (Pen. Code, § 187, subd. (a).)  Both murders were alleged to have been committed by means of lying in wait, a special circumstance.  (Pen. Code, § 190.2, subd. (a)(15).)  The information also alleged the special circumstance of multiple murders.  (*Id.*, subd. (a)(3).)  In addition, defendant was charged with attempted murder (Pen. Code, §§ 187, subd. (a), 664), two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), and making criminal threats (Pen. Code, § 422).

It was not disputed at trial that defendant shot and killed his one-time domestic partner, Maria Terrones, and a man she was dating, Jose Velarde-Lopez. A primary witness was Martha Camacho, Maria's "very good friend[]" for many years and the domestic partner of Maria's brother, Arturo Terrones.[1] According to Camacho, Maria had been living with defendant for four or five years before the killings. Over defense objection, Camacho was permitted to testify about defendant's abusive relationship with Maria. Certain of the testimony was known to Camacho only because Maria had told her—for example, that defendant strictly controlled Maria's activities, threatened her if she left him, had attempted to strangle Maria with a phone charger cord, pinched her, insulted her, and sexually assaulted her. On one occasion, however, Camacho saw defendant grab Maria by the chin and shove her head into the wall. Camacho said Maria told her she was "very afraid of living with" defendant, and Maria would only speak with Camacho when she was away from the house or in a private place.

In September 2010, Camacho testified, Maria moved out of the apartment she shared with defendant and moved into the Fairfield apartment Camacho shared with Arturo. Sometime thereafter, Arturo discovered the brake lines on Maria's car had been severed and the oil drained from the engine. As a result, Arturo and Camacho followed Maria every day as she drove to work. Camacho saw defendant at their apartment complex often, the first time on the day after Maria moved out of the apartment in which she and defendant lived. On "four . . . or five" occasions, defendant spoke with Camacho, asking her to turn Maria out of the apartment. Each time, defendant's demeanor was angry, and Camacho told defendant he needed to forget Maria and move on with his life. Maria told Camacho defendant also had visited Maria's place of work and spoken with her manager. At one point, defendant, using a copy of a key Camacho had given Maria before she left defendant, entered Camacho and Arturo's apartment. Defendant hurriedly left when Camacho screamed. After she changed the locks,

---

[1] To avoid confusion, we will refer to Maria and Arturo Terrones by their given names. We mean no disrespect by using the familiar form of address.

Camacho continued to see defendant pass by their apartment. Eventually, she went with Maria to obtain a domestic violence restraining order. The declaration executed by Maria in support of the restraining order, which was provided to the jury, largely reiterated matters about which Camacho testified.

There was other evidence of an obsessive relationship. Arturo testified that, after Maria moved out, he and Camacho followed her to work because defendant was following her. One day about a month after Maria moved out, as Arturo parked his truck outside their apartment, defendant walked up to the truck, grabbed Arturo by the shirt, and stuck a "big" knife against his chest. He demanded Arturo and Camacho put Maria out of their apartment. After Arturo refused, explaining Maria "was my sister," defendant followed Arturo as he drove to work. Several days later, as Arturo was leaving for work, defendant approached him and demanded the name and address of the man Maria was seeing. Defendant said he would return and kill Arturo if he did not provide the information. Defendant admitted to another person he had been following Maria and visiting her workplace, and defendant told the police he had warned Maria to "watch yourself" after she moved out.

Around 7:00 p.m. on November 12, 2010, Camacho and Maria saw defendant in a car in the parking area of Camacho's building. Maria confronted defendant, screaming that she had a restraining order. He told her "you're nobody, you're just a bitch," and said he had never seen the order. At this, Maria stood in front of defendant's car and sought help from other apartment residents, who used their own cars to prevent him from leaving. Defendant parked his car, got out and locked it, and ran across the street toward Arturo, who was standing by the door of his apartment. Defendant threatened Arturo with a knife before running off. The abandoned car was towed away later that evening.

After midnight the same night, Maria returned from dinner with Arturo, Camacho, and Velarde-Lopez. As they approached the door of their apartment, Camacho spotted defendant in the half-light, standing near a truck in the parking lot a short distance away. As she watched, defendant bent down and grabbed something from the tire of the truck. Camacho then urged the group to hurry into the apartment. Defendant walked toward

3

them and, from about 15 feet away, began shooting. Camacho and Arturo were able to run and hide. Maria stayed behind near the apartment and begged defendant to leave them alone. Defendant shot Maria in the head before chasing down Velarde-Lopez, who was partially disabled and had fallen while attempting to run. From a distance of less than 12 inches, defendant shot Velarde-Lopez. Maria slumped against the door of the apartment next to that of Camacho and Arturo, while Velarde-Lopez was found under an external staircase three apartments farther on.

Defendant was eventually caught in New Mexico and admitted the shootings. In an interview with police, defendant said he had stolen a gun from a neighbor two or three days before the shooting because he "needed a gun to kill [Velarde-Lopez]." At the time of the initial confrontation on November 12, defendant noticed that Maria and the others appeared to be going out. Assuming they would return to the apartment complex later that night, he returned with the loaded gun to wait. About an hour passed before the group returned. When they were almost to the door of the apartment, he attempted to intercept them. He said he chased and shot Velarde-Lopez, claiming Maria died because she "got in the way" as he was shooting at Velarde-Lopez. Defendant explained that he was "deep . . . in love" with Maria and was angry that she was dating another man. If he had the gun with him at the time of the earlier confrontation that evening, he said, he would "probably [have] use[d] it right there."

The jury convicted defendant of both murder charges and found true the special circumstance allegations of multiple murders and lying in wait as to each murder, but it acquitted him of the attempted murder of Arturo. He was also found guilty of making criminal threats and one of the two counts of assault with a deadly weapon against Arturo. Consecutive sentences of life without the possibility of parole were imposed for the murder charges.

## II. DISCUSSION

Defendant contends the trial court erroneously admitted hearsay evidence of his acts of domestic violence against Maria in the testimony of Camacho and the declaration by Maria in support of her request for a restraining order. We review a trial court's

4

admission of evidence for abuse of discretion.  (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131.)

In response to defendant's motion to exclude this evidence, the trial court tentatively ruled it generally admissible under Evidence Code[2] section 1109, subject to other objections, on the grounds it was "very probative . . . as to whether the defendant harbored premeditation and deliberation."  The court then held a hearing under section 402 to determine the reliability of the various statements.

At the hearing, Camacho testified that she rarely saw Maria for any length of time, but she often spoke with Maria by telephone during her lunch hour.  Prior to Maria's moving in with Camacho and Arturo, Maria had described to Camacho threats defendant had made.  She also had told Camacho that defendant had attempted to strangle her, had dropped a weight on her leg causing a bruise, pinched her while she was sleeping, and had sexually assaulted her on more than one occasion.  Ten days before the killing, Camacho went with Maria to the courthouse to obtain the restraining order.  Speaking English, Maria essentially dictated the declaration to a person at the courthouse, at the same time telling Camacho in Spanish what she was saying.  At that time, Maria described other acts of violence and obsessive behavior by defendant.

The trial court found the statements in the declaration, but not Maria's independent statements to Camacho, to be "testimonial" for purposes of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  It nonetheless ruled the declaration admissible under sections 1109, 1250, and 1370, concluding the confrontation clause objection had been forfeited pursuant to the doctrine of forfeiture by wrongdoing articulated in *Giles v. California* (2008) 554 U.S. 353 (*Giles*).[3]  The court found

---

[2] All further statutory references are to the Evidence Code.

[3] Section 1109 states that, in a prosecution for a crime involving domestic violence, evidence of other acts of domestic violence by the defendant is not made inadmissible by section 1101, which precludes the admission of evidence of a character trait to prove conduct in conformance with the trait.  (§ 1109, subd. (a)(1).)  Section 1250 allows the admission of a declarant's hearsay statement to prove the declarant's state of mind or physical sensation.  (*Id.*, subd. (a)(1).)  Section 1370 allows the admission of

5

defendant had killed Maria in part to prevent her from obtaining the restraining order or testifying at a hearing on the restraining order scheduled for November 24. The independent statements to Camacho were ruled admissible solely on the basis of section 1109. The court declined to exclude any evidence under section 352, although it noted the evidence could become cumulative.

We conclude the trial court erred in admitting this evidence. The declaration and any information Camacho learned only because she was present when the declaration was made are testimonial in nature under *Crawford*, as the court found. (E.g., *People v. Streeter* (2012) 54 Cal.4th 205, 239–240 (*Streeter*), disapproved on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834 [Attorney General concedes statements in restraining order declaration are "testimonial" under *Crawford*].)[4] Although, as *Giles* holds, a defendant's confrontation clause right to exclude such hearsay is forfeited if the defendant killed the declarant for the purpose of preventing testimony or cooperation with law enforcement (*People v. Banos* (2009) 178 Cal.App.4th 483, 501–502), there was no substantial evidence to support the trial court's attribution of that motive to defendant here. Because defendant learned Maria had already obtained the restraining order on the day of the killings, he cannot have killed her to prevent her from

hearsay statements describing the infliction of physical injury on the declarant under specific circumstances indicating its trustworthiness. (*Id.*, subds. (a)(1)–(5).)

[4] Although the Attorney General conceded the testimonial nature of precisely this type of evidence in *Streeter*, she contests the issue in this appeal. The Attorney General explains her decision to contest the issue here by pointing to the Supreme Court's post-*Streeter* statement in *People v. Dungo* (2012) 55 Cal.4th 608, that the primary purpose of a statement must pertain to a criminal prosecution to be "testimonial." (*Id.* at p. 619.) While we acknowledge the unrestricted nature of the statement in *Dungo*, the document there under consideration was an autopsy report, which the court described as having other, potentially nontestimonial uses. (*Id.* at p. 621.) We do not believe the "criminal prosecution" requirement was intended to apply when a statement claimed to be testimonial is, literally, testimony. Nothing in *Crawford* suggests that testimony given outside criminal proceedings is for that reason alone not testimonial. (*Crawford, supra*, 541 U.S. at pp. 51–52 ["Various formulations of this core class of 'testimonial' statements exist: . . . 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' "].)

6

obtaining the restraining order, as the trial court suggested. Further, because it is undisputed defendant was never served with the restraining order documents, there is no evidence he was even aware of the hearing scheduled for November 24, let alone that he killed Maria to prevent her from appearing there.

The Attorney General posits various statutory bases for admitting the declaration, such as sections 1202 and 1370. So long as the declaration was used to prove the truth of its contents, as it was here, these statutory bases could not excuse the confrontation clause violation. (See *People v. Blacksher* (2011) 52 Cal.4th 769, 808, fn. 23 [only hearsay statements admitted for purpose other than proving truth of matter asserted do not implicate the confrontation clause].) Further, section 1202, the primary statute on which the Attorney General relies, is not an independent hearsay exception. It allows *otherwise admissible* hearsay to be used to impeach another hearsay statement. (*Blacksher,* at p. 806 & fn. 22.) Such was not the case here.

The Attorney General argues Maria's statements about defendant's violent acts, both those made in the declaration and to Camacho, were admissible under *People v. Riccardi* (2012) 54 Cal.4th 758 (*Riccardi*) for the nonhearsay purpose of providing evidence of Maria's state of mind—her fear of defendant. While it is certainly true *Riccardi* holds that the violent acts of a domestic abuser can be admitted as circumstantial evidence of the abused person's fear (*id*. at pp. 822–823), we are reluctant to affirm their admission on this theory. Given defendant's confession of responsibility for the killings, Maria's fear of him was only tangentially relevant to the disputed issues at trial, and there was a good deal of other admissible evidence to prove her fear, including her decision to move out, her filing for a restraining order, and her unequivocal statement of fear to Camacho. The admission of evidence of acts of violence to prove a fact of marginal relevance that was firmly established by other, less inflammatory evidence carries a substantial risk of the type of prejudice that would preclude its admission under section 352. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1059 [" ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to

7

evoke an emotional bias against the defendant . . . and which has very little effect on the issues." ' "].)

The court also appears to have erred in admitting the remaining hearsay evidence. Section 1109, cited by the trial court, does not independently authorize the admission of hearsay evidence. The Attorney General acknowledges section 1370 was insufficient to support their admission, since they were neither written nor recorded nor made to medical or law enforcement personnel, as required by subdivision (a)(5). The Attorney General argues the nonhearsay purpose of proving Maria's state of mind, but we are skeptical of that justification for the reasons stated above.

Although the admission of the hearsay evidence of domestic violence was an abuse of discretion, we conclude it was not prejudicial under the "harmless beyond a reasonable doubt" standard of *Chapman v. California*, *supra*, 386 U.S. 18. (See *People v. Pearson* (2013) 56 Cal.4th 393, 463 [applying *Chapman* standard in these circumstances].) The prosecutor relied on this evidence primarily to prove premeditation, arguing defendant killed Maria from anger at her decision to leave and her refusal to return to the abusive and controlling relationship. As discussed above, there was substantial admissible evidence to demonstrate defendant's obsessive relationship with Maria and his violent anger over her decision to move. Camacho watched as defendant pushed Maria's head into a wall on the day she moved from the apartment. Defendant frequently followed her to work, apparently sabotaged her vehicle, haunted her new residence, admitted threatening her, and twice assaulted Arturo in connection with her. He broke into the apartment in which Maria was staying, and he repeatedly sought to persuade Arturo and Camacho to turn her out of the apartment. As Maria told Camacho, in a statement admissible as evidence of her state of mind, she was afraid of defendant, and she obtained a restraining order to keep him away. The acts of violence described by Maria to Camacho certainly added to the evidence of a violently obsessive relationship, but the evidence of such a relationship was already substantial. In an essentially identical situation, the court in *Riccardi* held that admission of this type of evidence in a murder trial to be harmless, given the substantial admissible evidence of "[the defendant's]

8

numerous acts of stalking [the victim] and inciting her fear." (*Riccardi, supra*, 54 Cal.4th at p. 829.)

To the extent defendant claims the evidence of several violent acts might have prejudiced the jury against him, the jury's acquittal of him on some of the charges, the attempted murder of Arturo and the second assault, suggests it dispassionately evaluated the evidence. Those acquittals were not the act of a jury inflamed by passion against defendant. Further, the evidence of domestic violence merely added to the evidence of other bad acts by defendant of which there was admissible evidence. Defendant admitted having intentionally killed a defenseless Velarde-Lopez, and there was substantial evidence from which the jury could have concluded he did the same to Maria. He menaced Arturo with a knife and threatened to kill him, and he pushed Maria's head against a wall. He stalked Maria and sabotaged her car. The hearsay evidence provided by Camacho of his earlier violent acts toward Maria would not have added materially to the negative impact of this admissible evidence.

Defendant claims the evidence of domestic violence prejudiced the jury's determination of the issues of premeditation and deliberation, but the evidence on these issues was simply too strong to have been materially influenced by the hearsay evidence of domestic violence. As noted above, there was substantial admissible evidence of defendant's anger and obsession, including Maria's professions of fear. Defendant himself stated that he formed the intent to kill Velarde-Lopez two days before the killings, when he stole the gun, and said he waited for an hour for the group to return with the admitted intent of ambushing them. The evidence of domestic violence added little to this more direct evidence of premeditation.

Defendant argues admission of the declaration was prejudicial because the prosecutor referred to statements in the declaration several times in closing argument. While we acknowledge these references, we conclude the prosecutor's use of the declaration was not prejudicial because, had the trial court excluded the declaration, the prosecutor would have been able to cite other, admissible evidence to make the same points. This is true, for example, of the prosecutor's reference to the declaration to prove

9

an abusive and controlling relationship, defendant's threat to kill Arturo, and his pushing Maria's head against the wall.  Accordingly, the prosecutor did not rely on hearsay evidence to prove facts that were not otherwise present in the record through properly admitted evidence.  The presence of alternative, admissible evidence distinguishes this situation from that of *People v. Gomez* (1999) 72 Cal.App.4th 405, disapproved on other grounds in *People v. Brown* (2004) 33 Cal.4th 892, 908, cited by defendant, in which the prosecutor relied during closing on inflammatory expert testimony that should have been excluded as irrelevant because it was not supported by any evidence in the record.  (*Id.* at pp. 415–416, 419.)

Because we find admission of the declaration and hearsay statements to have been harmless under the constitutional standard for prejudice, we need not address defendant's claim he was denied due process by the admission of the evidence.

### III.  DISPOSITION

The judgment of the trial court is affirmed.


_____
Margulies, Acting P.J.


We concur:


_____
Dondero, J.


_____
Becton, J.[*]


_____
[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

10